# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

In the Matter of the Search of:

Records and information associated with the cellular telephone assigned call number 414-234-2150 (Target Cell Phone 3) whose service provider is T-Mobile/Metro PCS.

)
)
)
)
)
)

Case No. _19 - MJ - 1318_

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A.

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B.

The basis for the search under Fed. R. Crim P. 41(c) is:

☒ evidence of a crime;
☒ contraband, fruits of crime, or other items illegally possessed;
☒ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: Title 21, United States Code, § 846, 841(a)(1) and 843(b).

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Mark N. Wagner, WIDOJ-DCI
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: _9/23/19_____

_____
*Judge's signature*

City and State: <u>Milwaukee, Wisconsin</u>

Honorable William E. Duffin , U.S. Magistrate Judge
*Printed Name and Title*

AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT

I, Mark Wagner, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephones assigned call number **(646) 342-9958, ("Target Cell Phone 1" (TCP1)), (414) 766-3834, ("Target Cell Phone 2" (TCP2))** and **(414) 234-2150 ("Target Cell Phone 3" (TCP3))**. **TCP1's** service provider is AT&T Mobility (Cingular) telephone, which is a service provider headquartered in North Palm Beach, Florida. **TCP2's** and **TCP3's** service provider is T-Mobile/Metro PCS, which is a wireless telephone service provider headquartered in Parsippany, New Jersey. **TCP1** is subscribed to "Prepaid Customer," of 1535 Broadway, New York, New York. **TCP2** is subscribed to "Harvey Donso," of 1360 West Windlake Avenue, Milwaukee, Wisconsin. **TCP3** is subscribed to "Metro Customer," of 1352 West Windlake Avenue, Milwaukee, Wisconsin. **TCP1, TCP2 and TCP3** are described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2.      I am a Special Agent with the Wisconsin Department of Justice - Division of Criminal Investigation (DCI), and have been since September, 2017. On May 22, 2018, I was deputized as a Task Force Officer with the United States Drug Enforcement Administration (DEA). Prior to my current assignment, I was employed as a Detective with the City of Milwaukee Police Department in Milwaukee, Wisconsin for twenty-five years. During the last 10 years of my previous employment, I was a Task Force Officer with the FBI assigned to the Wisconsin High Intensity Drug Trafficking Area (HIDTA) and the Joint Terrorism Task Force (JTTF). During my previous employment, I have been involved primarily in the investigation of large scale narcotics

traffickers operating not only in the City of Milwaukee and the State of Wisconsin, but also throughout the entire United States.

3.     As a law enforcement officer, I have participated in the investigation of narcotics-related offenses, resulting in the prosecution and conviction of numerous individuals and the seizure of illegal drugs, weapons, stolen property, millions of dollars in United States currency and other evidence of criminal activity. As a narcotics investigator, I have interviewed many individuals involved in drug trafficking and have obtained information from them regarding acquisition, sale, importation, manufacture, and distribution of controlled substances. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology utilized by the traffickers and abusers of controlled substances. I have participated in all aspects of drug investigations, including physical surveillance, execution of search warrants, undercover transactions, and court-ordered wiretaps, analysis of phone and financial records, and arrests of numerous drug traffickers. I have been the affiant on many search warrants. I have also spoken on numerous occasions with other experienced narcotics investigators, both foreign and domestic, concerning the methods and practices of drug traffickers and money launderers. Furthermore, I have attended training courses which specialized in the investigation of narcotics trafficking and money laundering. Through these investigations, my training and experience, and conversations with other law enforcement personnel, I have become familiar with the methods used by drug traffickers to manufacture, smuggle, safeguard, and distribute narcotics, and to collect and launder trafficking-derived proceeds. I am further aware of the methods employed by major narcotics organizations to thwart any investigation of their illegal activities.

4.     Based upon my training and experience, as well as information relayed to me during the course of my official duties, I know that a significant percentage of narcotics, specifically

2

marijuana, cocaine, heroin and methamphetamine, imported into the United States comes from Mexico and enters the domestic market at various points along the southwest border of the United States. Based on training and experience, I also know that a significant amount of cocaine, marijuana, heroin and methamphetamine enters the United States through Mexico, which controls the transportation and sale of cocaine, marijuana, heroin, and methamphetamine into the United States.

5. Additionally, I know that illegal narcotic sales in the United States generate billions of dollars annually, most of it in United States currency. Efforts to legitimize or "launder" this cash by the drug distributors are subject to detection because of intense scrutiny placed on large financial transactions by U.S. banks. To avoid detection, the cartels developed a number of money laundering systems to avoid financial transaction reporting requirements.

6. In addition, I have also learned narcotic traffickers routinely utilize narcotics proceeds to purchase assets, to include: real property and/or invest in legitimate business ventures. By doing so, narcotics proceeds are introduced into the financial system. The narcotics traffickers then utilize these assets to facilitate legitimate businesses designed to effectively launder drug proceeds. Once the assets are no longer needed, they are sold, potentially for a profit. Based on my training, experience, and conversations with other law enforcement officers, traffickers are also known to take narcotics proceeds and smuggle them back to the source of supply for the drugs through bulk currency transfers via vehicles or money orders.

7. Based on my experience in conducting criminal investigations of violations of the Controlled Substances Act, I know that "Drug Trafficking Organizations" (DTOs) have developed a number of methods to insulate their illegal activities from detection by law enforcement. These methods are common to major DTOs to varying degrees of sophistication.

3

8.      Based on my training, experience, and conversations with other law enforcement officers, I know that distributors of marijuana, methamphetamine, cocaine, heroin, as well as other controlled substances, often utilize cellular and "hardline" telephones.   Additionally, I know that drug dealers often change their phone numbers and cellular devices on a frequent basis in an attempt to thwart law enforcement from tracking their phones as well as a means to conceal their identities.   Based on my training, experience, and conversations with other law enforcement officers, I know that these individuals often use code words to discuss controlled substances and methods of concealing controlled substances while talking on the telephone.   Based on training, experience, and conversations with other law enforcement officers, I know that violators of the controlled substances law often conduct extensive counter-surveillance to avoid law enforcement detection.

9.      Based upon training and experience, I know that narcotics-trafficking and money-laundering organizations routinely utilize several operational techniques to sustain their illegal enterprises.   These practices are designed and implemented to achieve two paramount goals: (1) the successful facilitation of the organization's illegal activities, including the importation and distribution of controlled substances and the subsequent repatriation of the proceeds of that illegal activity; and (2) the minimization of the exposure of organization members, particularly those operating in management roles, from investigation and prosecution by law enforcement.   More specifically, based on my training and experience, I assert the following:

  a.      The more entrenched and sophisticated drug-trafficking organizations routinely compartmentalize their illegal operations.   The compartmentalization of operations reduces the amount of knowledge possessed by each member of the organization.   This method of operation effectively minimizes the potential damage an individual cooperating with law enforcement could inflict on the organization and further reduces the

4

adverse impact of a particular law enforcement action against the organization.

b.      Members of these organizations routinely utilize communications facilities, i.e. cellular telephones, to communicate directions and information about the organization's illegal activities to other organization members.

c.      During the course of these telephonic communications, organization members routinely use coded references and encryption in an effort to elude law enforcement detection.

d.      The communication of time sensitive information is critical to the successful conduct of these organizations' illegal activities. The critical nature of this information stems from the necessity of the organization's management to provide direction for the importation and distribution of narcotics, as well as, the subsequent laundering of the proceeds of those illegal activities.

e.      Narcotics traffickers, and money launderers associated with them, often confine their illegal telephonic communications to long-trusted organizational members and other high-level narcotics traffickers in an attempt to evade law enforcement and circumvent narcotics investigations; and

f.      Narcotics traffickers routinely utilize fictitious names, or other individuals, in which to register pagers, telephones, vehicles, real property, and utility services in order to avoid detection by law enforcement.

10.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5

11.     Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 846, 841(a)(1), and 843(b) (conspiracy to distribute controlled substances (cocaine and heroin) and use of a communication facility to facilitate a drug-trafficking crime) are being committed, and will be committed by Javier BERRIOS (Hispanic Male, DOB: 03/02/1976), Manuel PEREZ Jr. (Hispanic Male, DOB: 05-21-1993), Chad ESSER (White Male, DOB: 04-14-1981) and other associates of their drug trafficking organization ("BERRIOS DTO") who have yet to be identified.  There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations, and will lead to the identification of individuals who are engaged in the commission of these offenses.

## **PROBABLE CAUSE**

12.     In February 2018, Wisconsin Department of Justice - Division of Criminal Investigation (DCI) and members of the United States Drug Enforcement Administration - Milwaukee (DEA) initiated a narcotics investigation regarding multiple individuals working together to distribute large quantities of heroin and cocaine throughout Milwaukee, Wisconsin. Two of those individuals were later identified as Paul LAVOE and Javier BERRIOS.

13.     Case agents received information from a confidential source (hereinafter "CS #1") regarding the illegal drug trafficking activities of BERRIOS and LAVOE.  CS #1 has been providing reliable information to DCI since February, 2018.  Specifically, CS #1 conducted multiple controlled purchases of cocaine and heroin from BERRIOS and LAVOE.

14.     Based upon my training and experience, I know that a "controlled buy" (and/or controlled contact) is a law enforcement operation in which an informant purchases drugs from a target. The operation is conducted using surveillance, usually audio and video taping equipment,

6

and pre-recorded purchase money. When an informant is used, he/she is searched for contraband, weapons, and money before the operation. The informant is also wired with a concealed body recorder and monitoring device. When the transaction is completed, the informant meets cases agents at a pre-determined meet location and gives the purchased drugs and the recording/monitoring equipment to the case agents. The informant is again searched for contraband, weapons, and money. Additionally, all telephone calls made by the informant while under the direction and control of case agents are recorded.

15.     CS #1 has provided information about the membership, structure, and customs of the BERRIOS DTO. CS #1 has positively identified BERRIOS and LAVOE, members of the BERRIOS DTO, through Wisconsin Department of Transportation photographs.  CS #1 has conducted several, consensually-recorded conversations with BERRIOS and LAVOE, including audio and video recordings with LAVOE and BERRIOS, both in person and on the telephone during the course of this investigation.  CS #1 has conducted controlled purchases of heroin and cocaine from BERRIOS and LAVOE. CS #1's information concerning the BERRIOS DTO has been corroborated by other confidential sources, specifically confidential source #2 ("CS #2"), information obtained from various public databases, physical surveillance, and through controlled drug purchases, money deliveries and consensually-recorded conversations and phone calls that CS #1 had with BERRIOS and LAVOE. CS #1's information has never been found to be false or misleading.

16.     CS #1 has a criminal history that includes arrests for Possession of a Firearm by a Felon, Possession with the Intent to Deliver Cocaine and Heroin, Possession of Marijuana and Cocaine, Bail Jumping, Theft, and Criminal Damage to Property.  CS #1 is receiving consideration

in connection with a pending drug case from the Milwaukee County District Attorney's Office for his/her cooperation with law enforcement.

17.     CS #2 has a criminal history that includes arrests for Domestic Violence - Disorderly Conduct. CS #2 provided information against his/her penal interest and the information was corroborated by law enforcement officers through public databases and law enforcement reports. CS #2 has also provided information which has been corroborated through information provided by CS #1.

18.     CS #1 was interviewed by investigators in February, 2018 and provided detailed information about the current and past drug-trafficking activities of Paul LAVOE and Javier BERRIOS. CS #1 has been purchasing up to four and a half (4.5) ounces of cocaine, twice a week, from BERRIOS and LAVOE for the past year and a half. CS #1 explained he/she always has to call LAVOE, and LAVOE will then call BERRIOS at telephone (414) 301-0926 (hereafter Predecessor Phone 1 (PP1)). LAVOE contacts BERRIOS in order to arrange a meeting between CS #1 and BERRIOS at LAVOE's business, "PL Power Cycles," located at 1531 South 1st Street, Milwaukee, Wisconsin. BERRIOS will then meet CS #1 at LAVOE's business and sell cocaine and/or heroin to CS #1. CS #1 has made four controlled buys of cocaine and heroin from Paul LAVOE and Javier BERRIOS, between February 14, 2018 and to March 27, 2018.

19.     CS#1 stated BERRIOS also distributes large quantities of heroin to Desmond LOVE (aka "YPN Rex."). According to CS#1, LOVE is part of a Milwaukee-based rap music group, with members utilizing the "YPN" moniker on their names. CS#1 stated the "YPN" stands for "Young Paid Niggas" and "YPN" is believed to be a street gang operating in north Milwaukee, Wisconsin. In addition to making/producing rap music, "YPN" is believed to be involved in violent crimes, which include robbery, assault, and firearms-related crimes. Through an open-source

8

query of social media, investigators identified numerous Facebook profile accounts with "YPN" linked (Friends) to the "YPN Rex" profile. These accounts depict photographs, and videos of male subjects posing with assault-style rifles and handguns with extended magazines.

20.     The information CS #1 provided has been corroborated by case agents through controlled purchases of cocaine and heroin (as described below). For the reasons stated in paragraphs 14 through 20, I consider CS #1 to be reliable.

21.     On February 14, 2018, CS #1 made a controlled purchase of one ounce of cocaine from Paul LAVOE and Javier BERRIOS. CS #1 contacted Paul LAVOE at telephone (414) 477-3294. CS #1 explained to LAVOE that he/she wanted to "holler at Jay." LAVOE asked CS #1 if he, LAVOE, was going to get a "percentage" this time. CS #1 informed LAVOE that he/she would talk to him about it when they met. LAVOE told CS #1 to come down to the shop. Approximately an hour after CS #1 arrived at LAVOE'S business ("PL Power Cycles"), BERRIOS arrived, and BERRIOS sold CS #1 an ounce of cocaine for $1,100.00.

22.     On February 25, 2018, case agents received a subpoena return of toll records for the call number associated with LAVOE's telephone number for the time period of the controlled buy on February 14, 2018. Case agents analyzed the toll records which revealed the following:

- 09:11:29, LAVOE  received an incoming call from CS #1 (1 minute and 1 second).

- 09:13:11, LAVOE  made an outgoing call to PP1, which is utilized by BERRIOS (1 minute and 35 seconds).

- 10:22:05, LAVOE made an outgoing call to CS #1 (16 seconds).

- 10:22:39, LAVOE  made an outgoing call to PP1) (42 Seconds).

9

23.     Case agents are aware the toll records directly reflect the times of recorded calls made by CS #1 to LAVOE and the calls with LAVOE to BERRIOS (PP1) on February 14, 2018. Case agents also learned through public database searches that PP1 was associated with the Facebook page of "J Garage." Case agents are aware through public databases, the registered agent of "J Garage" is Javier BERRIOS.

24.     On March 27, 2018, CS #1 made a controlled buy of cocaine and heroin from BERRIOS and LAVOE. CS #1 called LAVOE and CS #1 asked LAVOE if he/she could meet at LAVOE's business. After arriving CS #1 informed LAVOE that he/she needed to two (2) ounces of cocaine and ten (10) grams of heroin. While in the presence of CS#1, LAVOE called BERRIOS at the PP1 and stated "Mr. President, Mr. President, your son is hungry." LAVOE then tried to explain to BERRIOS what CS #1 wanted and stated "two and three, two and four". CS #1 told LAVOE "two and ten" and LAVOE repeated "two and ten." After approximately 30 minutes, BERRIOS arrived at LAVOE's business and asked CS #1 what they wanted. CS #1 informed BERRIOS that he/she wanted two (2) ounces of cocaine and ten (10) grams of heroin. BERRIOS left the business and case agents' surveillance followed BERRIOS to 191 South 2nd Street, Milwaukee, Wisconsin, which is believed to be BERRIOS "stash house." BERRIOS entered the location for a short period of time and returned to LAVOE's business. After returning, BERRIOS sold CS #1 two (2) ounces of cocaine and ten (10) grams of heroin for a total of $3,000.00.

25.     On May 03, 2018, CS #1 made a controlled purchase of two (2) ounces of cocaine and twenty (20) grams of heroin from LAVOE and BERRIOS. CS #1 contacted LAVOE, and then LAVOE contacted BERRIOS at PP1. BERRIOS arrived at LAVOE's business and asked CS #1 what he/she needed. CS #1 told BERRIOS he/she wanted two (2) ounces of cocaine and twenty (20) grams of heroin. BERRIOS left LAVOE's business and case agents surveilled him to 191

10

South 2nd Street.  BERRIOS entered the building and exited a short time later.  BERRIOS returned to LAVOE's business and sold CS #1 two (2) ounces of cocaine and twenty (20) grams of heroin for a total of $3,800.00.

26.      On July 2nd, 2018, investigators conducted surveillance of "J Garage."  During their surveillance, investigators observed BERRIOS at the business.   Minutes later, investigators observed a black male subject arrive at "J Garage" and carry a large white bag into the business.  Approximately five minutes later, the same male subject exited the business carrying the same white bag and departed the area.  Investigators later identified the male subject as Desmond LOVE, an alleged member of the "YPN" ("Young Paid Niggas") street gang.  Based on their training and experience, and the investigation to date, investigators believe LOVE had just conducted a drug/money transaction with BERRIOS.

27.      Investigators later analyzed the telephone tolls on BERRIOS' predecessor telephone.  On July 2, 2018 from approximately 9:42 a.m. to 12:55 p.m., BERRIOS was in telephonic contact with telephone (414) 306-2287, a total of four times.  Days later, investigators contacted the Milwaukee County Probation/Parole office, who confirmed LOVE was under supervision in Milwaukee with the same listed contact phone number as the number in contact with BERRIOS as described above: (414) 306-2287.

28.      Over the next several months, investigators continued to exploit all available investigative leads into BERRIOS, including the identification of another predecessor phone (PP2): (414) 915-4664.  During this time, investigators learned that LAVOE was out of the country.  In Spring 2019, LAVOE returned to the Milwaukee, Wisconsin area.  Investigators attempted to reconnect CS #1 to BERRIOS through LAVOE, however, LAVOE was unwilling to contact BERRIOS for the drug/money transaction.

11

29.     Investigators continued to conduct telephone toll analysis of PP2, and learned that in mid-April 2019, BERRIOS appeared to transition to another telephone number: **(414) 234-2150** (**TCP3**).  On May 24, 2019, the Honorable Nancy Joseph, U.S. Magistrate Judge, Eastern District of Wisconsin, authorized an order for a Pen Trap & Trace on BERRIOS' telephone (**TCP3**).  During this time, BERRIOS was in frequent contact with PP1, which investigators later learned was the phone number displayed in the "J Garage" business window at 7520 West Stevenson Street, Milwaukee, Wisconsin.

30.     Additionally, BERRIOS (**TCP3**) was in frequent contact with telephone **(646) 342-9958** (hereinafter referred to as **TCP1**).  **TCP1's** listed subscriber is "Manny Manuel," 1352 West Windlake Avenue, Milwaukee, Wisconsin 53215.  On August 13, 2019, **TCP1** was ported to AT&T wireless, which litsed the subscriber as "Prepaid Customer," 1535 Broadway, New York, New York.

31.     In late August 2019, investigators debriefed a Source of Information (SOI #1) who provided information on members of the BERRIOS DTO.  SOI #1 stated he/she knew BERRIOS through an associate, identified as Manuel PEREZ Jr.  SOI #1 has known PEREZ Jr. for several years, and provided **TCP1** as PEREZ Jr.'s cellular telephone number.  SOI #1 stated BERRIOS owned a vehicle repair shop on West Stevenson Street near 76th Street in Milwaukee, Wisconsin.  SOI#1 stated BERRIOS utilizes the shop to distribute heroin and cocaine.  SOI #1 stated PEREZ Jr. works at BERRIOS' shop.   SOI #1 also stated that PEREZ Jr. distributes narcotics on behalf of BERRIOS and PEREZ Jr.'s father, Manuel PEREZ Sr.  SOI #1 stated PEREZ Sr. also frequents BERRIOS' shop in order to oversee the distribution of narcotics.  SOI #1 believes the shop is mainly a "front" for BERRIOS' drug trafficking activities, as SOI #1 has observed a relatively low volume of vehicles being repaired during SOI #1's visits to the shop.  SOI #1 stated he/she believes

12

that PEREZ Sr. obtains large quantities of narcotics (cocaine) from a yet unidentified source of supply in Indiana.

32.     SOI#1's criminal history includes traffic offenses (Operating after Revocation, Reckless Driving and Operating while Intoxicated).  SOI #1 is receiving consideration in connection with a pending drug case from the Waukesha County District Attorney's office for his/her cooperation with law enforcement.

33.     SOI #1 further stated that in June 2019, SOI #1 began visiting BERRIOS' shop ("J Garage," 7520 W. Stevenson Street, Milwaukee, Wisconsin.) at the direction of PEREZ Jr.  While there, PEREZ Jr. introduced SOI#1 to BERRIOS and PEREZ Sr.  Approximately one week later, PEREZ Jr. brought SOI#1 to PEREZ Jr.'s residence, located on South 71st Street near West Orchard, West Allis, Wisconsin.   While inside the residence, PEREZ Jr. showed SOI#1 approximately six (6) kilograms of cocaine, and six (6) kilograms of heroin.  PEREZ Jr. and SOI#1 discussed their ability to distribute that amount of narcotics.  They agreed that it would be difficult to distribute the quantity of heroin and cocaine in a reasonable time frame.  SOI#1 stated he/she and PEREZ Jr. then loaded the narcotics in SOI #1's vehicle and drove to BERRIOS's shop. BERRIOS reluctantly received the narcotics and placed them inside his (BERRIOS) black Mercedes SUV.

34.     SOI #1 further stated that the next day, SOI #1 returned to BERRIOS' shop, where BERRIOS provided SOI #1 with approximately one hundred (100) grams of heroin, and one (1) kilogram of cocaine.  SOI #1 stated the kilogram had the initials "JB" imprinted on it.  SOI #1 later paid BERRIOS a partial payment of $16,000 while they were in the presence of PEREZ Sr.

35.     SOI #1 stated that he/she and PEREZ Jr. obtained a second kilogram of cocaine while at BERRIOS' shop, which they divided in half.  SOI #1 stated while waiting for the cocaine,

SOI #1 observed BERRIOS direct an employee, known to SOI #1 as "Chad," to go elsewhere to retrieve the cocaine. SOI #1 stated that "Chad" departed in an older-model Chevrolet Blazer and then returned to the shop after a short while. SOI #1 stated "Chad" brought SOI#1 to "Chad's" vehicle, where "Chad" removed the kilogram of cocaine from inside, before handing the cocaine to SOI#1. SOI#1 described "Chad" as a white male, mid-30's, short stature. Investigators believe "Chad" is Chad ESSER, as supported by multiple surveillances of the shop, where ESSER is present, and observed operating an older-model blue Chevrolet Blazer, with a white hood. SOI#1 stated he/she believed BERRIOS and PEREZ Sr. purposely avoid telephonic contact with their distributors, instead relying on PEREZ Jr. and ESSER to contact and meet with these individuals to further compartmentalize their DTO.

36.     Through previous telephone toll analysis of PP1 and **TCP3**, investigators identified a commonly called number of (414) 766-3834 (hereinafter referred to as **TCP2**), which is subscribed to "Harvey Donso" of 1360 West Windlake Avenue, Milwaukee, Wisconsin 53215. Further analysis of this number showed it to be in frequent contact with two numbers identified as belonging to Milwaukee area heroin and cocaine distributors. The first telephone number, (262) 383-0248, has been identified as belonging to Rafael CONCEPCION. CONCEPCION is currently the target of a heroin and cocaine investigation by the Milwaukee Police Department (ACISS Case: 18-9206). Furthermore, investigators have observed CONCEPCION during surveillance arriving at BERRIOS' shop and BERRIOS' stash house located at 191 South 2nd Street, Milwaukee, Wisconsin. On one occasion, investigators observed CONCEPCION arrive at BERRIOS's shop and stay for a short duration.

37.     The second telephone number in frequent contact with **TCP2** is telephone (414)

892-3971.  Investigators identified this number as belonging to Rayvon EDWARDS.  EDWARDS is currently the target of a heroin and cocaine investigation by the Milwaukee Police Department (ACISS Case: 19-4302).  EDWARDS was previously identified as an associate of the "YPN" street gang.  Investigators have observed EDWARDS arrive at BERRIOS' shop on one occasion, where EDWARDS stayed for a short duration.  Additionally, EDWARDS is currently on a GPS ankle monitoring device for a previous State of Wisconsin drug arrest.  Investigators have obtained historical GPS location information on EDWARDS' device, which showed it to make several stops at BERRIOS' shop over the last few months.

38.     Lastly, investigators identified a number in contact with **TCP2** listing to a Marlene Esser.  Investigators queried law enforcement databases, which listed a Marlene Esser with a residence of 5926 South Packard Avenue, Lot 74, Cudahy, Wisconsin.  Investigators further learned that Chad ESSER is also listed at this same address.  Investigators believe M. Esser is the mother of C. ESSER.

39.     Based on investigators' training and experience, and the investigation to date, investigators believe C. ESSER is the user of **TCP2**.  This belief is supported by **TCP2's** frequent contact with **TCP3**, the two identified drug distributors mentioned above, and contact with a telephone listing to M. Esser.  This belief is further supported by statements made by SOI #1, that BERRIOS and PEREZ Sr. use PEREZ Jr. and C. ESSER to communicate with area distributors on their own cellular telephones (**TCP1** – PEREZ Jr.) (**TCP2** – C. ESSER.)  Investigators seek authorization for GPS location information on **TPC1, TCP2 and TCP3**, to assist in monitoring the movements of Berrios,  PEREZ Jr. and C. ESSER as they pick up/drop off narcotics/narcotics-related proceeds; identifying stash house locations throughout Milwaukee, Wisconsin, and any out-of-state source locations (such as Indiana).

15

40.      The affiant is trained and experienced in the administration of the Nark II, 07 Field Test, which tests for the presence of cocaine and cocaine base. The affiant is also trained and experienced in the administration of the Nark II, 11 Field Test, which tests for the presence of heroin. The affiant has used both field tests in the past and found them to be reliable; the affiant subjected samples of the substances purchased from the confidential source in aforementioned paragraphs (see paragraphs 22, 25 and 26) and that the results of the field tests were consistent with the presence of cocaine and heroin, respectively.

41. Case agents with DCI, DEA and Department of Homeland Security – Homeland Security Investigations (HSI) are investigating Javier BERRIOS, Manuel PEREZ Sr., Manuel PEREZ Jr., and Chad ESSER for conspiracy to distribute cocaine and heroin. The investigation to date has included traditional law enforcement methods, including, but not limited to: controlled buys, interviews with confidential sources and sources of information, information from other law enforcement officers, documentary evidence, pen register, trap and trace, and telephone toll data, recorded telephone calls with targets, and physical surveillance.

42.      In my training and experience, I have learned that T-Mobile/Metro PCS and AT&TMobility (Cingular) are companies that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the cellular telephones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site

16

data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

43.     Based on my training and experience, I know that T-Mobile/Metro PCS and AT&T Mobility (Cingular) can collect E-911 Phase II data about the location of **TCP1**, **TCP2**, and **TCP3** including by initiating a signal to determine the location of **TCP1, TCP2,** and **TCP3**, on T-Mobile/Metro PCS's and AT&T Mobility (Cingular) network or with such other reference points as may be reasonably available.

44.     Based on my training and experience, I know that T-Mobile/Metro PCS and AT&T Mobility (Cingular) can collect cell-site data about the Target Cell Phones

## AUTHORIZATION REQUEST

45.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

46.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Cell Phone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates,

17

and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

47.     I further request that the Court direct T-Mobile/Metro PCS and AT&T Mobility (Cingular) to disclose to the government any information described in Attachment B that is within the possession, custody, or control of T-Mobile/Metro PCS and AT&T Mobility (Cingular) for a time period of 45 days from the date the warrant is signed. I also request that the Court direct T-Mobile/Metro PCS and AT&T Mobility (Cingular) to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with T-Mobile/Metro PCS's and AT&T Mobility (Cingular) services, including by initiating a signal to determine the location of the Target Cell Phone on T-Mobile/Metro PCS's and AT&T Mobility (Cingular) network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate T-Mobile/Metro PCS and AT&T Mobility (Cingular) for reasonable expenses incurred in furnishing such facilities or assistance.

48.     I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cell Phones outside of daytime hours.

18

## ATTACHMENT A

### Property to Be Searched

1. The cellular telephones assigned call numbers **(646) 342-9958**, ("**Target Cell Phone 1"** **(TCP1)**), **(414) 766-3834**, ("**Target Cell Phone 2**" (TCP2)) and **(414)234-2150 ("Target Cell Phone 3" (TCP3)),** **TCP1** whose service provider is AT&T Mobility (Cingular) telephone service provider headquartered in North Palm Beach, Florida. **TCP2** and **TCP3** whose service provider is T-Mobile/Metro PCS, a wireless telephone service provider headquartered in Parsippany, New Jersey.

2. Information about the location of the **Target Cell Phones** that is within the possession, custody, or control of T-Mobile/Metro PCS and AT&T Mobility if needed: including information about the location of the **target telephones (TCP1, TCP2 and TCP3)** if the telephone and/or telephones is and/or are subsequently assigned a different call number.

## ATTACHMENT B

### Particular Things to be Seized

All information about the location of the **Target Cell Phones (TCP1, TCP2 and TCP3)** described in Attachment A for a period of forty-five days from the date the warrant is signed, during all times of day and night. "Information about the location of the Target Cell Phones" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of T-Mobile/Metro PCS and AT&T Mobility (Cingular) , T-Mobile/Metro PCS and AT&T Mobility (Cingular) is required to disclose the Location Information to the government. In addition, T-Mobile/Metro PCS and AT&T Mobility (Cingular) must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with T-Mobile/Metro PCS's and AT&T Mobility (Cingular) services, including by initiating a signal to determine the location of the **Target Cell Phones (TCP1, TCP2 and TCP3)** on T-Mobile/Metro PCS's and AT&T Mobility (Cingular) network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate T-Mobile/Metro PCS and AT&T Mobility (Cingular) for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).